UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

JACOBSON WAREHOUSE CO., INC., *et al.*,

                    Plaintiffs,

        -against-

PRESTIGE BRANDS, INC.,

                  Defendant.

-------------------------------------------------------------x

**DECISION AND ORDER**

20-cv-4416 (CS) (AEK)

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**

      In this contract dispute, Plaintiffs are Jacobson Warehouse Company, Inc. (n/k/a GXO Logistics Warehouse Company, Inc.), Jacobson Logistics Company L.C., and XPO Logistics Supply Chain, Inc. (n/k/a GXO Logistics Supply Chain, Inc.)—transportation and logistics companies operating under the ultimate parent company XPO Logistics, Inc. (collectively, "XPO" or "Plaintiffs").  ECF No. 1 ¶¶ 4-6, 11.  Defendant is Prestige Brands, Inc. ("Prestige"), a consumer products company that "manufactures, markets and sells a variety of consumer healthcare products nationwide."  ECF No. 24 ¶ 5.  This litigation arises out of a warehousing and transportation management agreement entered into by the parties in March 2012.  ECF Nos. 1 ¶ 2, 24 ¶ 1.  As set forth in the Complaint, XPO alleges that Prestige used XPO's services to "store and pick, pack, and ship its inventory from the warehouse XPO lease[d] on Prestige's behalf to Prestige's retail customers, such as CVS and Walmart."  ECF No. 1 ¶ 2; *see also* ECF No. 24 ¶ 1.  XPO and Prestige have asserted claims and counterclaims against one another for, *inter alia*, breach of contract.  ECF Nos. 1, 24.

      Before the Court are two discovery motions: (1) Plaintiffs' motion to compel discovery related to the work of Stroz Friedberg LLC, ECF Nos. 68, 75; and (2) Plaintiffs' motion for a

protective order regarding a set of requests for admission served by Defendant, ECF Nos. 82, 107.  For the reasons set forth below, Plaintiffs' motion to compel is GRANTED, and Plaintiffs' motion for a protective order is GRANTED IN PART and DENIED IN PART.

## I.      PLAINTIFFS' MOTION TO COMPEL

### A.      Background

During an April 30, 2021 meet-and-confer regarding merits discovery, XPO informed Prestige of an apparent gap in Prestige's document production from a key time period.  *See* ECF Nos. 52 at 1, 68 at 2.  Days later, Prestige, through its counsel, retained Stroz Friedberg LLC ("Stroz"), which counsel describes as "a highly-respected digital forensics firm," for the purpose of assisting "with the investigation and recovery efforts for a data gap in Prestige's document production."  ECF Nos. 67 at 1, 67-1 (Stroz engagement letter).  Prestige's counsel also directed Stroz to prepare a report "detailing its investigation and recovery efforts and factual findings" (the "Stroz Report").  ECF No. 67 at 2.  According to Prestige, when counsel retained Stroz, Prestige did not contemplate that Stroz would testify in these proceedings.  *See* ECF Nos. 67 at 1-2 (Stroz was retained for "consulting and technical services regarding the forensic imaging and analysis of digital media belonging to Prestige"), 72 at 2 ("the role of Stroz has shifted over time"); 10/15/2021 Conf. Tr. 20: 22-25 (explaining that Stroz was not "hired as a spoliation expert," but rather was "hired to figure out what happened and recover data").

On May 24, 2021, XPO served Prestige with document requests, and a deposition notice pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, related to the apparent data loss.  ECF No. 68 at 3.  Thereafter, Prestige designated a Stroz employee as a Rule 30(b)(6) witness to testify on behalf of Prestige about matters related to the data loss and Stroz's investigation.  *See* ECF Nos. 67-3 at 3, 68 at 4-5 (deposition topics include "[t]he engagement,

analysis, work, actions and reports of Stroz Friedberg"; "the failure of the 'email archiving system . . . [to] properly fetch emails during that time period'"; "the system having 'corrected itself'"; and Stroz's "investigation into this issue").

Although Prestige provided to XPO, pursuant to a "non-waiver stipulation," certain documents generated by and reviewed by Stroz, Prestige also has asserted that Stroz is a "non-testifying expert" and that Stroz's work product and related communications are therefore privileged pursuant to Rule 26(b)(4)(D) of the Federal Rules of Civil Procedure.  ECF No. 67 at 1-3.  XPO wrote to the Court requesting an order to compel production of the withheld documents and communications related to Stroz's investigation.  ECF No. 68.

After subsequent discussions between the parties, Prestige produced to XPO the Stroz Report and "over 2,600 pages of accompanying materials that were considered or relied upon by Stroz in preparing the Stroz Report."  ECF Nos. 72 at 1, 75 at 1-2.  The Court held a conference on October 15, 2021 to hear from the parties regarding the remaining issues in dispute.  In supplemental letter submissions, the parties explained that the only remaining issues for discovery regarding Stroz are XPO's requests for (1) any documents and communications that are discoverable under Rule 26(b)(4)(C), and (2) any communications between Stroz and Prestige's IT personnel.  ECF Nos. 72 at 2, 75 at 4.

## B.    Applicable Legal Standards

Under the Federal Rules of Civil Procedure, with certain limited exceptions, a party typically may not obtain discovery of "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."  Fed. R. Civ. P. 26(b)(4)(D).  In other words, "ordinarily, 'the [ ] facts known or opinions held' by a *consulting* expert are not

discoverable." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 293 F.R.D. 568, 575 (S.D.N.Y. 2013) (emphasis in original) (quoting Fed. R. Civ. P. 26(b)(4)(D)).

To the contrary, when an expert is expected to testify, the proponent's disclosure obligations are significant.  Under Rule 26(a)(2)(B), testifying experts must produce a written report containing the witness's opinions along with "the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B)(ii).  The intention behind Rule 26(a)(2)(B)(ii), as revised in 2010, "is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients.  The disclosure obligation extends to any facts or data 'considered' by the expert in forming the opinions to be expressed, not only those relied upon by the expert."  *Secs. & Exch. Comm'n v. Rio Tinto PLC*, No. 17-cv-7994 (AT) (DF), 2021 WL 2186433, at *4 (S.D.N.Y. May 28, 2021) (quoting Fed. R. Civ. P. 26 Advisory Committee Notes to 2010 Amendment).  While communications between an expert and the attorney for the party that retained the expert generally are protected by Rule 26(b)(4)(C), the protection is subject to certain exceptions. Specifically, attorney-expert communications must be produced to the extent the communications: "(i) relate to compensation for the expert's study or testimony; (ii) identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or (iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed."  Fed. R. Civ. P. 26(b)(4)(C).

In some instances, the lines between a consulting expert and testifying expert are blurred. So-called dual capacity experts are "single experts who serve as both non-testifying consulting experts and as testifying experts."  *Rio Tinto*, 2021 WL 2186433, at *5.  Where experts serve in these dual roles, "courts are forced to grapple with what must be disclosed when an expert

alternately dons and doffs the 'privileged' hat of a litigation consultant and the 'non-privileged hat' of the testifying witness." *Id.* (quotation marks omitted).  Courts have determined that it might be possible to claim a work product protection over certain materials if there is a clear delineation between the expert's role as a consultant and his or her role as a testifying expert, because "documents having no relation to the expert's role as a[ ] [testifying] expert need not be produced." *MTBE*, 293 F.R.D. at 575 (alterations omitted) (quoting *B.C.F. Oil Ref., Inc. v. Consol. Edison Co. of N.Y., Inc.*, 171 F.R.D. 57, 62 (S.D.N.Y. 1997)).

"In cases involving dual-capacity experts, the party resisting disclosure bears the burden of showing that the expert did not consider certain documents in forming his testimonial opinion." *Rio Tinto*, 2021 WL 2186433, at *5 (alteration, emphasis, and quotation marks omitted).  To satisfy this burden, the party opposing disclosure must show that "the documents could not have been considered by the expert in forming his opinion" or "present[ ] the court with affidavits and deposition testimony clearly establishing that the testifying witness never read, reviewed, or considered the subject documents in forming his opinions." *Id.* (quotation marks omitted).  This burden "cannot generally be satisfied merely by counsel's representations or by the expert's representations alone." *Id.* (quotation marks omitted).  Where "documents reviewed by an expert in his role as a consultant appear to also inform his expert report supporting his proposed testimony, they will be subject to discovery." *Id.* (quotation marks and alterations omitted).  Additionally, "any ambiguity as to the role played by the expert when reviewing or generating documents should be resolved in favor of the party seeking discovery." *See, e.g.*, *MTBE*, 293 F.R.D. at 575 (quotation marks omitted).  "[I]n most instances, if the subject matter of the consulting work directly relates to the opinion in the expert report, there will be at least an ambiguity as to whether the materials informed the expert's opinion, and

disclosure will be required." *Rio Tinto*, 2021 WL 2186433, at *5 (quotation marks and alterations omitted).

### C.    Analysis

The parties disagree as to Stroz's role in this litigation.  In its submissions to the Court, XPO consistently has asserted that Stroz is a testifying expert because "[Stroz] is testifying, it is an expert, and it has produced a written report plus materials relied upon (an obligation reserved for testifying expert witnesses under Rule 26(a)(2)(B))."  ECF No. 75 at 4.  Meanwhile, in its supplemental submission to the Court, Prestige describes Stroz as a consulting expert that has been designated "to testify during the 30(b)(6) deposition in order to provide the most useful testimony possible," and continues to insist that "Stroz is not a testifying expert . . . because Prestige does not intend to use Stroz to present testimony at trial under Federal Rules of Evidence 702, 703, or 705."  ECF No. 72 at n.4.  Neither party addresses the possibility that Stroz has functioned as a dual-capacity expert in this matter, even though there seems to be little (if any) dispute that "the role of Stroz has shifted over time."  *See id.* at 2.

With respect to the document production and privilege disputes that are currently before the Court, Prestige has elected to waive the blanket argument that all of the documents at issue are not discoverable pursuant to the non-testifying expert provision of Rule 26(b)(4)(D).  Instead, Prestige asks the Court to consider Stroz to be a testifying expert for purposes of this analysis. *Id.* at 2-3.  Thus, in evaluating XPO's outstanding document demands and the parties' privilege arguments regarding the Stroz materials, the Court will assume that at present, Stroz is a testifying expert and that Stroz is generally subject to the expert disclosure obligations associated with a testifying expert.  *See generally* Fed. R. Civ. P. 26 Advisory Committee Notes to 1970 Amendment (explaining that discovery of a testifying expert is intended to promote "[e]ffective

cross-examination of an expert witness" since a "lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand").

As to XPO's demand for communications between Prestige's counsel and Stroz, Prestige's waiver of the Rule 26(b)(4)(D) argument makes this simple: Prestige must produce any communications between counsel and Stroz that "(i) relate to compensation for the expert's study or testimony; (ii) identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or (iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed."  Fed. R. Civ. P. 26(b)(4)(C).[1]

XPO also seeks "communications between Stroz and Prestige's IT personnel," arguing that there is "no doubt that communications between Stroz and Prestige are fact, data and/or assumptions the expert considered in forming its opinions."  ECF No. 75 at 4.  In its papers, XPO identifies language from the Stroz Report that suggests information "which appear[s] to have no basis in logs, device analysis, or any other objective examination" was provided to Stroz by Prestige employees or Prestige's counsel.  *Id.* at 2-4.  In particular, XPO notes that on numerous occasions, the Stroz Report refers to facts that Stroz "understands," *i.e.*, facts that Stroz did not independently discover.  *E.g. id.* at 2 (quoting Stroz Report).  Though it is addressed only briefly, XPO contends that the protections of Rule 26(b)(4)(C) are limited to communications between the expert and the relevant party's attorney, and should not be extended to communications between the expert and the party itself.  *Id.* at 4.

---

[1] Prestige claims that it "has already produced everything to which XPO would be entitled if Prestige designated Stroz as a testifying expert . . . ."  ECF No. 72 at 2-3.

Prestige maintains that communications between Stroz and Prestige are protected by attorney-client privilege and the work product doctrine, "[r]egardless of counsel's presence on a communication," because "those communications took place at the direction of counsel to assist counsel in, *inter alia*, addressing and investigating the data issue before the Court." ECF No. 72 at 3. The wholesale assertion of privilege over any and all communications between Prestige employees and Stroz employees, however, is not sufficient in this context. According to Prestige, the relationship between Stroz and Prestige is analogous to that of a law firm client and an accountant employed by the firm as described in *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). *See* ECF No. 72 at 3-4. In *Kovel*, the Second Circuit held that communications between the accountant and the client concerning the client's complex tax matter were privileged insofar as "the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." 296 F.2d at 922. The privilege recognized in *Kovel* has been applied to non-testifying experts. *See, e.g.*, *U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*, 852 F. Supp. 156, 161 (E.D.N.Y. 1994) (recognizing *Kovel* has been applied "to representatives of the attorney, such as accountants; administrative practitioners not admitted to the bar; *and non-testifying experts*") (emphasis added) (citing 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 503(a)(3)[01] (1993)). But it does not necessarily follow that the same privilege consideration should be applied to testifying experts. The accountant in *Kovel*—and other types of agents to whom the *Kovel* principle has been extended, *see id.* (citing cases)—are all comparable to consulting experts, whose communications are generally not subject to discovery. To categorically apply the attorney-client privilege to all communications between clients and *testifying* experts would give such communications even greater protections than communications between testifying

experts and *counsel* for the relevant party, which are subject to the limitations of Rule 26(b)(4)(C). A blanket application of the attorney-client privilege to communications between party representatives and a testifying expert would "interfere with the goal of the [expert] disclosure requirements, which is to allow an adversary to expose whatever weaknesses, unreliabilities, or biases might infect the opinions of testifying experts called by an adverse party." *MTBE*, 293 F.R.D. at 577 (quotation marks and alterations omitted). For these reasons, Prestige cannot make a universal assertion of privilege over all communications between Stroz and Prestige employees.

Prestige's wholesale assertion that communications between Stroz and Prestige employees "are plainly covered by the . . . work product doctrine," ECF No. 72 at 3, is similarly flawed. Again, it would not make any sense for there to be *greater* protections for communications between client representatives and testifying experts than there are for communications between the relevant party's counsel and a testifying expert. Indeed, courts have determined that communications between testifying experts and non-attorneys that do not include counsel are not entitled to the broad protections from disclosure afforded by Rule 26(b)(4)(C). *See, e.g.*, *Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*, No. 12-cv-220 (WWE), 2014 WL 655206, at *2-4 (D. Conn. Feb. 20, 2014) (ordering party to produce documents, including "communications between a client representative and testifying expert" "unless they fall within the purview of Rule 26(b)(4)(B)-(D) and/or the attorney-client privilege") (citing *In re Application of the Republic of Ecuador*, 735 F.3d 1179 (10th Cir. 2013)); *Fialkowski v. Perry*, No. 11-5139, 2012 WL 2527020, at *1, *4-5 (E.D. Pa. June 29, 2012) (holding that documents "prepared by plaintiff at the direction of her attorney which plaintiff's expert witness reviewed in preparing his report" must be disclosed because the documents contained facts or data that the

expert considered in forming his opinions); *cf. Heard v. Statue Cruises LLC*, No. 16-cv-1079 (ALC) (BCM), 2020 WL 1285456, at *9 (S.D.N.Y. Mar. 18, 2020) ("Nor does the work product doctrine protect communications between experts in which no attorney is involved.").  The Advisory Committee Notes to the 2010 Amendment make clear that Rule 26(b)(4)(C) is designed to protect only *counsel's* work product, *i.e.*, documents and communications that implicate "theories or mental impressions *of counsel*."  *Fialkowski*, 2012 WL 2527020, at *3-4 (emphasis in original) (citing Fed. R. Civ. P. 26 Advisory Committee Notes to 2010 Amendment).  Thus, Prestige may not withhold communications between Stroz and Prestige employees by asserting a general work product protection that seems designed in part to bring such communications within the ambit of Rule 26(b)(4)(C).  To the extent Prestige believes *specific* communications between Prestige employees and Stroz are entitled to protection, Prestige must note this in a privilege log of all documents withheld.  *See* Fed. R. Civ. P. 26(b)(5); Local Civ. R. 26.2.

While Prestige may not categorically withhold all communications between Stroz and Prestige, a subset of communications pertaining solely to Stroz's work as a consultant may be protected.  Notwithstanding Prestige's request that the Court consider Stroz a testifying expert for purposes of this analysis, *see* ECF No. 72 at 2-3, it is possible that Stroz nonetheless served Prestige purely as a consulting expert in some respects at certain points in time, and can thus be considered a dual-capacity expert, *see* ECF Nos. 52 at 1 (June 25, 2021 letter to Court disclosing Prestige's counsel had retained Stroz to "assist with an investigation and recovery effort"), 72 at 2 ("the role of Stroz has shifted over time").  Accordingly, particular communications between Stroz and Prestige may be protected work product under Rule 26(b)(4)(D) if Prestige can satisfy its burden of showing that Stroz "did not consider certain documents in forming [its] testimonial

opinion." *Rio Tinto*, 2021 WL 2186433, at *5 (emphasis and alteration omitted).  If Prestige has

a basis to withhold certain communications under Rule 26(b)(4)(D) based on such a dual-

capacity analysis, it must note this in a privilege log.  If XPO challenges Prestige regarding the

basis of these withheld documents, Prestige will bear the burden of proving the documents were

not consulted by either showing "the documents could not have been considered by [Stroz] in

forming [its] opinion" or with "affidavits and deposition testimony clearly establishing that

[Stroz] never read, reviewed, or considered the subject documents in forming [its] opinions." *Id*.

(quotation marks omitted).

* * * * * * * * * *

With respect to communications between Prestige's counsel and Stroz, Plaintiffs are

entitled to the documents and communications delineated in Rule 26(b)(4)(C)—specifically,

communications that (i) relate to compensation for Stroz's study or testimony; (ii) identify facts

or data that Prestige's counsel provided and that Stroz considered in forming the opinions

expressed by Stroz; and (iii) identify assumptions that Prestige's attorney provided and that Stroz

relied on in forming the opinions expressed by Stroz.

As to communications between Prestige personnel and Stroz, Prestige cannot rely on

categorical assertions of the attorney-client privilege or the work product doctrine.  Any

communications between Stroz and Prestige personnel that contain facts, data, and/or

assumptions Stroz considered in forming the expert opinions and conclusions that are the

subjects of its testimony in this matter must be produced.  To the extent there are additional

communications beyond these for which Prestige believes a specific assertion of privilege is

warranted, the withheld documents must be identified and explained in a properly formatted privilege log.[2]

## II.     PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER

### A.     Background

By letter motion dated December 2, 2021, XPO sought a protective order with respect to a set of requests for admission ("RFAs") served by Prestige.  ECF No. 82.  The RFAs, totaling 1,000 individual requests, concern 162 separate shipments and ask that XPO admit, among other things, (1) XPO's role in packaging and delivering shipments of Prestige products, and (2) that Prestige customers reported that certain shipments did not contain the correct type and/or number of products ordered, or were otherwise errant.  *See* ECF No. 82 at 1; 01/04/2022 Conf. Tr. 34: 8-9; *see generally* ECF No. 82-1 (original set of RFAs).[3]  The RFAs refer to documents from a

---

[2] In its supplemental submission regarding Stroz discovery issues, Prestige also "reiterates its request that the Court limit the scope of any XPO deposition of Stroz to exclude questions concerning Stroz's opinions of subjects outside the scope of its engagement and the supplemental 30(b)(6) topics as to which [the designated witness] has been proffered to speak." ECF No. 72 at 4.  The Court will not issue an anticipatory ruling about potential questions that may be raised during the course of the deposition, other than to note that there are, of course, limitations applicable to the scope of questions that may be asked during a Rule 30(b)(6) deposition and a deposition of an expert witness.  If particular objections arise during the course of the deposition, the parties may contact the Court to resolve those objections.

[3] In response to a request from XPO that Prestige withdraw the RFAs, Prestige offered instead to revise them "in an effort to clarify and improve its requests in light of XPO's initial objections."  ECF Nos. 84 at 3; *see* 82-2 (illustrative set of revised RFAs).  Rather than presenting distinct factual assertions, however, each of the revised RFAs attempts to consolidate numerous factual propositions into a single request.  For example, one revised RFA reads:

> Admit that, for each of the Orders identified in Appendix A, the difference between the items that the Customers reported having received, on the one hand, and the items that the Customers ordered, on the other hand, constitutes a Net Shortage in the amounts listed in Appendix A, as reflected by the Payment Adjustments identified in Appendix A.

trove of tens of thousands of pages of materials produced by Prestige and organized, according to Prestige, by transaction in a manner that "track[s] the life of each order."  01/04/2022 Conf. Tr. 22: 13-17.  A number of the RFAs, through various means, seek authentication of documents produced by Prestige.  ECF No. 84 at 3.

In its initial letter motion, XPO objects to the RFAs on the grounds that they (1) "improperly seek to establish thousands of factual propositions on matters that Plaintiffs vigorously dispute" and (2) "are [o]verly [b]urdensome."  ECF No. 82 at 2-4.  Prestige filed a response to XPO's letter motion on December 7, 2021, in which it argues that "the RFAs seek only the admission of simple and undisputed facts, often by way of authentication" and that the RFAs, while "voluminous," are "reasonable and not unduly burdensome."  ECF No. 84 at 3-4. The Court held a conference on January 4, 2022, during which it heard further argument.  The Court then directed XPO to respond to a subset of the RFAs so that "Prestige is able to see what the responses and what the objections are" and allow the Court to "evaluate more precisely what type of burden it really did pose for XPO to respond to this subset."  01/04/2022 Conf. Tr. 28:18-29:4.  On February 2, 2022, XPO submitted a second letter motion in further support of its request for a protective order, with appended sample responses to the RFAs.  ECF Nos. 107, 107-1.  The Court held a second conference on February 9, 2022, which addressed this issue as well as various other pending discovery disputes.  Prestige filed a final submission responding to XPO's second letter motion on February 23, 2022.  ECF No. 119.

---

ECF No. 82-2 at 3.  Because the combined nature of the revised RFAs makes them facially improper, this Decision and Order addresses the original RFAs rather than the revised versions.

B.      **Applicable Legal Standards**

Rule 36 of the Federal Rules of Civil Procedure provides that "[a] party may serve on any other party a written request to admit . . . the truth of any matters within the scope of Rule 26(b)(1) relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents." Fed. R. Civ. P. 36(a)(1). "Rule 36 is not a discovery device. The purpose of the rule is to reduce the costs of litigation by eliminating the necessity of proving facts that are not in substantial dispute, to narrow the scope of disputed issues, and to facilitate the presentation of cases to the trier of fact." *T. Rowe Price Small-Cap Fund Inc. v. Oppenheimer & Co., Inc.*, 174 F.R.D. 38, 42 (S.D.N.Y. 1997).

"This does not mean, of course, that an RFA may only ask about matters that the propounding party believes to be undisputed." *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 18-cv-4044 (BCM), 2020 WL 9549505, at *2 (S.D.N.Y. Nov. 30, 2020). The 1970 amendments to Rule 36 make clear that a party may not object to an RFA "solely on the ground that the request presents a genuine issue for trial." Fed. R. Civ. P. 36(a)(5); *see also* Fed. R. Civ. P. 36(a) Advisory Committee Notes to 1970 Amendment. "Since the very purpose of the request is to ascertain whether the answering party is prepared to admit or regards the matter as presenting a genuine issue for trial, an answer, rather than an objection, is now the only proper response if a party considers that it has been asked to admit something that it disputes." *U.S. Bank Nat'l Ass'n*, 2020 WL 9549505, at *2 (alterations and internal citation omitted) (quoting 8B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2256 (3d ed.)). Likewise, "the fact that an admission, provided in response to a request, may prove decisive to the case is no ground for refusal to respond." *Id.* (quotation marks omitted).

Additionally, there is no requirement that the party being asked to authenticate a document be the owner or creator of the document. *Pasternak v. Kim*, No. 10-cv-5045 (LTS) (JLC), 2011 WL 4552389, at *6 (S.D.N.Y. Sept. 28, 2011) ("RFAs are intended to narrow issues for trial, and if parties were constrained to use RFAs to authenticate only documents that had been produced by an opponent, the intent behind the Rule would be largely defeated."). "[T]he authentication of 'any described documents' is specifically contemplated by Rule 36(a)(1)(B)." *Id.*; *see also Sequa Corp. v. Gelmin*, No. 91-cv-8675 (CSH), 1993 WL 350029, at *2 (S.D.N.Y. Sept. 7, 1993) (largely denying motion for protective order where responding parties "neither authored nor have the originals of some of the documents" because "[i]n short, purported ignorance does not justify relieving a party of its obligation to respond to a request"). It is, however, improper for RFAs to seek admissions "as to the content and interpretation—rather than genuineness—of documents" that were not authored or owned by the respondent. *BAT LLC v. TD Bank, N.A.*, No. 15-cv-5839 (RRM) (CLP), 2018 WL 3626428, at *5-6 (E.D.N.Y. July 30, 2018).

In response to a properly constructed RFA, a party must either admit the matter, "specifically deny it[,] or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). An RFA denial "must fairly respond to the substance of the matter." *Id.* The responding party has an obligation to undertake a "'reasonable inquiry' of 'information known or readily obtainable by [it]' that allows [it] to fairly admit or deny the request." *T. Rowe Price*, 174 F.R.D. at 43 (quoting Fed. R. Civ. P. 36(a)). What constitutes both a "reasonable inquiry" and information that is "readily obtainable" by the party will necessarily vary from case to case. *Id.* "If an RFA overreaches, the answering party may seek a protective order quashing or limiting . . . the offending requests." *U.S. Bank Nat'l Ass'n*, 2020 WL

9549505, at *3.  "However, because [R]ule 36 admission requests serve the highly desirable purpose of eliminating the need for proof of issues upon trial, there is a strong disincentive to finding an undue burden in responding where the responding party can make the necessary inquiries without extraordinary expense or effort." *T. Rowe Price*, 174 F.R.D. at 43 (quotation marks and alterations omitted).

"Although it is 'not always easy' to determine whether a party has drafted or responded to an RFA appropriately, '[t]he Court is 'invested with substantial discretion under Rule 36'' to resolve such questions and control discovery accordingly." *U.S. Bank Nat'l Ass'n*, 2020 WL 9549505, at *3 (quoting *Versatile Housewares v. SAS Grp.*, No. 09-cv-10182 (KMK) (PED), 2010 WL 11601225, at *1 (S.D.N.Y. July 15, 2010)).

### C.    Analysis

#### 1.    XPO's General Objections

XPO has raised a number of general objections to the RFAs, many of which are without merit.  First, XPO claims the RFAs are improper insofar as they concern "facts [that] are central to the ultimate issues of liability and damages . . . posed by Prestige's counterclaim."  ECF No. 82 at 2-3.  This objection is unavailing.  It has long been the case that "a party may not object to an RFA 'solely on the ground that the request presents a genuine issue for trial.'"  *U.S. Bank Nat'l Ass'n*, 2020 WL 9549505, at *2 (quoting Fed. R. Civ. P. 36(a)(5)).  The party is required either to deny the matter or set forth reasons why it cannot admit or deny it.  "[A]n answer, rather than an objection, is now the only proper response if a party considers that it has been asked to admit something that it disputes."  *Id.* (quotation marks omitted).

Second, XPO has asserted that the RFAs improperly shift the "the burden of proving a case from the proponent of that case to the opponent of the case."  02/09/2022 Conf. Tr. 37: 2-9;

*see also* ECF No. 107 at 5 ("Prestige has the burden of proof on its counterclaims . . . .  Prestige

is plainly seeking to dodge that burden by trying to substitute the hard part of litigating . . . with

unintelligible and inappropriate RFAs.").  This objection is also unpersuasive.  It is well-

established that the mere fact that the RFAs concern a matter about which the requesting party

has the burden of proof is not a proper ground for objection.  *See City of Hartford v. Monsanto*

*Co.*, No. 3:15-cv-1544 (RNC), 2017 WL 3085682, at *2 (D. Conn. July 20, 2017) (quoting 8B

Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2254 (3d ed.) ("Nor is

it ground for objection that the request relates to matters on which the requesting party has the

burden of proof.")).

Third, Plaintiffs assert that "what is perhaps motivating Prestige" is that Prestige may

seek attorneys' fees "if ultimately they prevail in convincing a jury that some of these variances

are XPO's fault."  01/04/2022 Conf. Tr. 13:19-14:16.  Under Rule 37(c) of the Federal Rules of

Civil Procedure:

> If a party fails to admit what is requested under Rule 36 and if the requesting party
> later proves a document to be genuine or the matter true, the requesting party may
> move that the party who failed to admit pay the reasonable expenses, including
> attorney's fees, incurred in making that proof.

Fed. R. Civ. P. 37(c)(2).  But Rule 37 provides various circumstances in which the party that

failed to admit would not be liable for attorneys' fees, including that "the party . . . had a

reasonable ground to believe that it might prevail on the matter" and "there was other good

reason for the failure to admit."  Fed. R. Civ. P. 37(c)(2)(C), (D).  Hence, "[t]he party runs no

risk of sanctions if the matter is genuinely in issue, since Rule 37(c) provides a sanction of costs

*only when there are no good reasons for a failure to admit*."  Fed. R. Civ. P. 36(a) Advisory

Committee Notes to 1970 Amendment (emphasis added).  To the extent Plaintiffs deny a fact

that is truly at issue, they should not be concerned that they will be liable for attorneys' fees.

Accordingly, these three general objections are all overruled as bases for XPO's lack of response to the RFAs.

Finally, XPO objects on the ground that responding to the requests would impose an undue burden on XPO given the number and form of the requests.  ECF Nos. 82 at 4, 107 at 2-5. In some instances, the "sheer number of requests served on [a party] warrant a protective order on the basis of oppression and undue burden."  *Galgano v. Cty. of Putnam*, No. 16-cv-3572 (KMK) (PED), 2021 WL 3159844, at *1 (S.D.N.Y. June 30, 2021) (quotation marks omitted). Likewise, where requests are "prolix, argumentative, confusing and embrace compound subjects, actors, events and assertions," the recipient may be excused from responding with a simple "admit or deny."  *See Hill v. Payne*, No. 18-cv-6022 (EAW), 2022 WL 875924, at *8 (W.D.N.Y. Mar. 8, 2022) (quotations and alterations omitted) (denying motion to compel further discovery responses); *see also Scott v. Keller*, No. 2:07-cv-00184-KJD-PAL, 2010 WL 1267772, at *3-4 (E.D. Cal. Mar. 31, 2010) (granting protective order where "[m]any of the requests are compound rather than separately stated, seek a legal conclusion, assume disputed facts, request[ ] speculation, or are unintelligible").  While "there is a strong disincentive to finding an undue burden," *T. Rowe Price*, 174 F.R.D. at 43, courts have excused parties from responding to requests where "the requests are not readily admitted or denied, [and] the time spent on answering the requests by [parties] and their counsel would be abusive, unreasonable, and oppressive," *Tamas v. Family Video Movie Club, Inc*., 301 F.R.D. 346, 347-48 (N.D. Ill. 2014). As set forth below, the Court agrees that responding to certain of Prestige's requests would impose an undue burden on XPO; accordingly, this objection is sustained with respect to certain categories of RFAs, but overruled with respect to the remaining categories, as set forth further below.

      2.      **RFAs Concerning What Customers Reported Receiving and Returned**

One subset of the RFAs asks XPO to admit facts about items Prestige customers reported

receiving and why certain items were returned.  Those RFAs are substantially similar to the

following formulations:

- Admit that the items that [Customer] ordered in connection with the invoice produced at [PBH-00XXXXX] differed from the items that it reported receiving, as reflected on the proof of delivery produced at [PBH-00XXXXX] and the payment adjustments produced at [PBH-00XXXXX].

- Admit that the difference between the items that [Customer] ordered and the items that it reported receiving in connection with the invoice produced at [PBH-00XXXXX] reflects a net shortage of at least [$XXX].

- Admit that the items that [Customer] reported receiving in connection with the invoice produced at [PBH-00XXXXX] differed from the items listed on the Logiview shipment report generated by XPO and produced at [PBH-00XXXXX].

- Admit that the items that [Customer] ordered in connection with the invoice produced at [PBH-00XXXXX] differed from the items that it reported receiving, as reflected on the payment adjustment produced at [PBH-00XXXXX] and the bill of lading produced at [PBH-00XXXXX].

- Admit that [Customer] returned a portion of the items that it received in connection with the invoice produced at [PBH-00XXXXX] because the products were short-dated, as reflected on the returns tally sheet produced at [PBH-00XXXXX] and the returns form produced at [PBH-00XXXXX].

These categories of requests ask XPO to, in part, review voluminous, hand-marked

documents described by defense counsel as order forms that were "mark[ed] . . . sign[ed] . . . and

stamp[ed]" by store clerks and purportedly indicate the store clerk "received [an order], but it's

short X amount or it's otherwise incorrect."  01/04/2022 Conf. Tr. 22: 13-25.  From there, XPO

is asked to engage in an interpretation exercise to discern what products customers claim to have

received and/or why certain products were returned.  *See id.* 7:25-8:24.  XPO has objected to

these requests on the bases that "Plaintiffs are not percipient witnesses as to facts related to

[Customer's] receipt of items"; "Plaintiffs are not percipient witnesses as to why [Customer] returned certain items"; "and that Plaintiffs have not been presented with evidence from which to draw the requested factual conclusion[s]." *See, e.g.*, ECF Nos. 96-2 at 14, 107-1 at 4.  These objections are well-founded; it appears that through these requests, Prestige is improperly attempting to seek admissions "as to the content and interpretation—rather than genuineness—of documents." *See BAT LLC*, 2018 WL 3626428, at *5-6.

These requests concerning what customers reported receiving and why items were returned constitute a large volume of the overall requests. *See generally* ECF No. 82-1.  Indeed, 47 of the first 100 RFAs ask XPO to admit some fact about what customers returned and/or reported receiving. *See id.* at 4-15.  Plaintiffs have represented that they do not have direct knowledge about what Prestige's customers reported receiving and lack information to draw the conclusions requested by the RFAs. *See, e.g.*, ECF No. 107-1 at 4.  Instead, the only way for XPO to respond to these categories of requests would be to supply its own interpretation of the documents referenced in the RFAs.  "Given that the requests are not readily admitted or denied, the time spent on answering the requests by [XPO] and their counsel would be abusive, unreasonable, and oppressive." *Tamas*, 301 F.R.D. at 348.  The Court therefore grants Plaintiffs' application for a protective order with respect to the RFA formulations listed above based on the improper nature of the requests and the undue burden that would be imposed on XPO in responding to the voluminous requests in these categories.

### 3.    RFAs Concerning Actions Taken by XPO

Another subset of the RFAs asks XPO to admit that "XPO was responsible for picking, packing, and shipping [Customer's] order reflected on the invoice produced at [PBH-00XXXXX]."  XPO has objected to this request formulation on the basis that XPO "rarely if

ever 'packed' orders."  ECF No. 107 at 2-3.  But the language in the RFAs—referring to XPO's

service of "picking, packing, and shipping"—is taken directly from the Complaint.  *See* ECF No.

1 ¶ 2 ("Prestige utilizes XPO's services to store and *pick, pack, and ship* its inventory")

(emphasis added).[4]  The Court disagrees with XPO's contention that this formulation of RFA is

"completely inappropriate."  *See* ECF No. 107 at 2.  Indeed, based on XPO's own

representations, these seem like precisely the sort of "facts that are not in substantial dispute"

that are appropriately handled via RFA.  *See T. Rowe Price*, 174 F.R.D. at 42; *see also* ECF No.

1 ¶ 2.  For these reasons, XPO must respond to RFAs that ask XPO to admit it was responsible

for "picking, packing, and shipping" specific orders that are reflected in the invoices provided by

Prestige.  To the extent that XPO cannot truthfully admit or deny these RFAs, XPO should "state

in detail" the issue and why that issue prevents XPO from truthfully admitting or denying the

RFA; to the extent XPO lacks sufficient knowledge or information to admit or deny the RFAs, it

must state "that it has made reasonable inquiry and that the information it knows or can readily

obtain is insufficient to enable it to admit or deny."  Fed. R. Civ. P. 36(a)(4).

### 4.    RFAs Concerning XPO Records

Prestige also has asked XPO to admit inconsistencies related to certain reports—

"Logiview shipment reports"—that were generated by XPO.  Those RFAs are substantially

similar to the following formulations:

---

[4] XPO also objects that it cannot admit it was responsible for "picking and shipping an order *conforming* to" a particular invoice when Prestige itself "often directed XPO to pick an order and get it out the warehouse door, without regard to whether it conformed to a customer's order."  ECF No. 107 at 3 (emphasis in original).  Notably, the word "conforming" was inserted by XPO itself; the RFAs do not use the term.  *See* ECF No. 82-1.  The Court is not persuaded by XPO's attempt to further complicate the RFAs by injecting meaning that appears to exceed the plain language of the requests.

- Admit that the Logiview shipment report generated by XPO and produced at [PBH-00XXXXX] did not accurately reflect the contents of that shipment.

- Admit that XPO did not verify the accuracy of the Logiview shipment report produced at [PBH-00XXXXX] when it created the report.

The RFAs define "Logiview shipment reports" to mean "any report generated by XPO's Logiview system in connection with a particular shipment, reflecting the type and quantity of items that were ordered and the type and quantity of items that XPO claimed to have shipped." ECF No. 82-1 at 3.  XPO has objected to this formulation of request on a number of the general bases discussed above, along with the more specific objection that "it is premised on defined terms"—including "Logiview shipment report"—"that are not neutral, are unreasonable, and have been crafted by Defendant for its own benefit . . . ."  *See, e.g.*, ECF No. 107-1 at 5-6.  Based on the plain language of the "Logiview shipment reports" definition alone, the Court disagrees with Plaintiffs' characterization.  XPO must respond to RFAs that ask XPO to admit whether its own reports were accurate.  If XPO has any specific issue with the definition (*e.g.*, the reports generated by XPO's Logiview system are not meant to reflect the type and quantity of items that were ordered), XPO should "state in detail" the issue and why said issue prevents XPO from truthfully admitting or denying the RFA.  Fed. R. Civ. P. 36(a)(4).

### 5.     RFAs Concerning Whether XPO Verified Shipments

The final subset of the RFAs asks XPO to admit that on numerous occasions, "XPO did not verify the contents of the shipment in connection with the invoice produced at [PBH-00XXXXX] before it shipped."  XPO claims ignorance, asserting that "it is unclear what ['verify'] means, especially given the variegated nature of Prestige's products, which come in different sizes, quantities, have different labels, and so on."  ECF No. 107 at 4-5.  This argument is not sufficient to warrant a protective order for this category of RFAs, as the phrase "verifying contents" certainly seems comprehensible.  XPO must respond to RFAs that ask XPO to admit

that it did not verify certain shipments.  Again, XPO should follow the requirements of Rule 36(a)(4) to the extent it concludes that it cannot truthfully admit or deny the requests or that it lacks sufficient knowledge or information to respond.

## CONCLUSION

For the reasons set forth above, XPO's motion to compel discovery, filed at ECF No. 68, is GRANTED.  By June 13, 2022, Prestige must produce a log listing any communications between Prestige employees and Stroz employees that Prestige seeks to withhold on specific privilege grounds.  *See* Fed. R. Civ. P. 26(b)(5); Local Civ. R. 26.2.  No later than June 22, 2022, the parties must meet and confer about any issues raised in the log.

XPO's motion for a protective order, filed at ECF No. 82, is GRANTED IN PART and DENIED IN PART as set forth in this Order.  The parties are directed to meet and confer about a proposed deadline for XPO's responses to the RFAs.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 68.

Dated: May 23, 2022
White Plains, New York

SO ORDERED.

_____
ANDREW E. KRAUSE
United States Magistrate Judge